IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LUIS SIERRA, | § | |
| | § | No.   21, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below:   Superior Court of |
| | § | the State of Delaware |
| v. | § | |
| | § | ID. No. 1006013865A (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:   September 2, 2020
Decided:   November 4, 2020


Before **SEITZ**, Chief Justice; **VAUGHN** and **TRAYNOR**, Justices.


Upon appeal from the Superior Court.   **AFFIRMED**.


Natalie S. Woloshin, Esquire, Woloshin, Lynch & Associates, P.A., Wilmington, Delaware, for Appellant, Luis Sierra.

Andrew J. Vella, Esquire, Delaware Department of Justice, Wilmington, Delaware, for Appellee, the State of Delaware.


**VAUGHN**, Justice:

# I.     INTRODUCTION

The Appellant, Luis Sierra, was convicted in Superior Court of two counts of Murder in the First Degree, three counts of Possession of a Firearm During the Commission of a Felony, Robbery in the First Degree, and Conspiracy in the Second Degree.   His convictions were affirmed on direct appeal.[1]   He has now moved for postconviction relief.   His motion has been denied by the Superior Court.   On appeal, Sierra claims that the Superior Court erred in rejecting his contention that he received ineffective assistance of counsel at trial because his counsel (1) failed to call available fact and expert witnesses, (2) failed to object to prejudicial testimony offered by the State, and (3) failed to object to prosecutorial misconduct during closing arguments.   He also claims the Superior Court's denial of his motion is inconsistent with this Court's decision in *Fowler v. State*.[2]   We have concluded that Sierra's claims must be rejected and the judgment of the Superior Court should be affirmed.   We begin with the facts and procedural history of the case.

## II.     FACTS AND PROCEDURAL HISTORY

On June 12, 2010, at approximately 8:40 p.m., Wilmington police officers were dispatched to Allen's Alley to respond to a shooting complaint.   On arrival, they observed Anthony Bing, Jr. lying on the ground with several gunshot wounds.

---

[1] *Sierra v. State*, 2014 WL 1003576 (Del. Mar. 7, 2014) (TABLE).
[2] 194 A.3d 16 (Del. 2018).

An autopsy later revealed that Bing had been shot three times, and three bullets were recovered from his body. The police did not find any shell casings at the crime scene. During their investigation, police found a hand print on a red Pontiac parked near the location of Bing's body. The print was determined to belong to Gregory Napier. Napier was interviewed and eventually implicated himself, Sierra, and Tywaan Johnson as being involved in Bing's murder. He identified Sierra as the one who shot Bing. Sierra and Johnson were indicted for Murder in the First Degree and related offenses. Napier accepted a plea agreement to manslaughter and other offenses. Johnson was tried first and convicted on all counts.

At Sierra's trial, which was tried as a capital case, Christopher Plunkett was called as a witness for the State. He testified that on the night of Bing's murder, Bing called him around 6:30 p.m. to ask for a ride to Philadelphia. Plunkett drove Bing to Philadelphia in the red Pontiac later found near Bing's body. In Philadelphia, Bing picked up a bag of marijuana. On the way back, they stopped briefly so Bing could put the bag of marijuana in the trunk of the car. When they arrived back in the Wilmington area, Bing asked Plunkett to make a stop at Allen's Alley in Wilmington so Bing could get rid of the bag of marijuana. At Allen's Alley, Plunkett parked the vehicle and remained inside while Bing exited. Three men then arrived (later identified as Sierra, Johnson, and Napier) and gathered around Bing. In his testimony, Plunkett described them as Persons 1, 2 and 3, and

2

identified Sierra as Person 2.   As the three men spoke with Bing, Plunkett heard someone shout, "where is it, where is it, where is it"[3] and saw guns being drawn on Bing by Sierra and Person 3.   Persons 1 and 3 (Johnson and Napier) then confronted Plunkett at his vehicle.   One of the two searched the passenger area of the Pontiac. The other confronted Plunkett at his window, seized the keys from the ignition and asked "where is it," and "do you want to die over this?"[4]   Plunkett was told to pop the trunk open.   Sierra and one of the others then searched the trunk.   Plunkett then witnessed Bing and Person 3 scuffle, "almost like [Bing] was trying to take his gun from him,"[5] and then heard simultaneous shots fired by Sierra and Person 3. Sierra then fired another shot.   Napier and Johnson then fled.   Sierra shot Bing again, and then he fled.   Plunkett described Sierra's firearm as a black gun which appeared to be a revolver.

Napier testified that on the night of the murder, Sierra, Johnson (aka "Reality") and Napier (aka "G Baby"), were planning on purchasing marijuana from someone traveling from Philadelphia.   According to his testimony, the trio convened at roughly 7:30 p.m.   They walked to Allen's Alley where they found Bing standing outside of the red Pontiac.   Johnson and Bing were speaking when Johnson and Sierra pulled guns on Bing.   Napier then took the keys out of the

---

[3] App. to Opening Br. at A204 [hereinafter A__].
[4] *Id*.
[5] *Id*.

ignition of the red Pontiac and ordered Plunkett to open the trunk. Sierra held Bing at gun point while Johnson searched for, found and grabbed the marijuana. Napier and Johnson started fleeing when Napier heard a shot, turned to look, and witnessed Sierra shoot Bing while standing over him. Napier testified that Sierra shot Bing at least three times with a black revolver. He described Johnson's gun as an "automatic."[6] Napier, Johnson, and Sierra reconvened at a house later that evening. The following line of questioning took place between the prosecutor and Napier about that meeting. Napier's answers are relevant to Sierra's claim that his trial counsel failed to object to prejudicial testimony offered by the State:

> Q: Okay. What is the defendant saying?
>
> A: I mean, he wasn't really – I mean, he was saying little stuff here and there, like, he was kind of, like, like, praising what he had done.
>
> Q: That's what I was going to ask you. What was his demeanor?
>
> A: I mean, I guess, he liked what he had done.
>
> Q: And why do you say that?
>
> A: Because words that he said, words he was saying that he wasn't mad or nothing, he wasn't worried about nobody else; you know what I mean?
>
> Q: What words did he use, if you remember?
>
> A: One time it was – one time he said this was his first

---

[6] A237.

4

one and this and that, referring to, I guess, murder.[7]

The State also called David Succarotte, who considered himself close friends, almost like family, with Sierra. He testified that while the two were incarcerated in prison together at a time after the murder, Sierra spoke about this case. By Succarotte's account, Sierra told him that a person named "G," another named "Reality," and Sierra were going to "Ashford's Alley."[8] Sierra and Reality had plans to rob a drug dealer, which G knew nothing about. Sierra and Reality were both armed, G was not. When the three arrived, G took the keys out of the dealer's car ignition and guns were immediately drawn on Bing. After the drugs were seized from the car, the dealer told Sierra that he was not going to get away with it. Sierra then shot the dealer, walked over, and shot him two more times.

Succarotte contacted the Attorney General's Office regarding his knowledge of this case in hopes of getting his unrelated sentence reduced. The State asked, "If you're as close with the defendant as you tell us you are, why would you write the Attorney General's Office saying that you had information on his pending case?"[9] Succarotte's answer is also relevant to Sierra's claim that his trial counsel failed to object to prejudicial testimony offered by the State:

> A: I'm not going to lie and say I didn't want my
> original plea and to come home early, but I asked myself

---

[7] A239-40.
[8] A271-72.
[9] A273.

5

> the same question every day. It was hard for me to get up here today and testify against him. But when you look in my eye and you tell me with no sympathy and just no nothing that you took a man's life and that – you know, that's a thin line.[10]

Defense counsel did not object.

Kevin Fayson was another witness called by the State. Fayson shared a prison cell with Sierra from February to June of 2011. According to Fayson, Sierra told him that Reality, G Baby and Sierra set up a drug dealer whom they robbed and killed. The plan was to lure the dealer to Allen's Alley under the guise of purchasing drugs so they could rob him. Upon arrival, the dealer was waiting for Sierra outside of a car. Sierra and Reality approached the victim and G Baby approached the driver. Sierra and Reality then pulled out guns and G Baby took the keys out of the ignition. They ordered the driver to open the trunk so they could search for the drugs, and while they were searching, Sierra shot the victim. Sierra then shot him again and the three men ran off.

No guns connected to the crime were ever found. Carl Rone, who was employed as a forensic firearms examiner for the Delaware State Police at the time of trial, testified concerning his report on the three bullets recovered from Bing's body. Rone concluded that all three bullets were fired from the same gun, a .38 or .357 caliber revolver. Additionally, in response to being asked whether a

---

[10] *Id.*

6

semiautomatic handgun could have fired them, he stated that a Desert Eagle—a semiautomatic handgun—potentially could, but that it was not likely.

In his amended motion for postconviction relief, Sierra claimed multiple grounds of ineffective assistance of counsel.   Meanwhile, on May 3, 2018, while Sierra's amended motion for postconviction relief was pending in Superior Court, an arrest warrant was issued for Rone, alleging that from January 1, 2016, to December 31, 2017, (a time which postdated Sierra's trial by several years), he committed theft by false pretenses and falsified business records to be paid for work not performed.   Rone pled guilty to both charges.   Sierra then supplemented his amended motion to add an additional claim based on Rone's arrest and this Court's decision in *Fowler v. State*.[11]   In his supplemented motion, Sierra argued that Rone's testimony was critical to the State's theory of the case and that it was undermined by the report of Dr. Frederick Wentling, an expert retained by the defense during the postconviction proceedings.   In his report, Dr. Wentling stated that all three bullets were fired from the same firearm, but he could not determine the type of weapon given the condition of the bullets.

The Superior Court rejected Sierra's ineffective assistance of counsel claims on the grounds that Sierra failed to meet his burden to establish actual prejudice

---

[11]  194 A.3d 16.

under the second element of *Strickland v. Washington*.[12]  It rejected his claim based

on *Fowler v. State*[13]  on the grounds that *Fowler* was distinguishable.

## III.  STANDARD OF REVIEW

We review the Superior Court's denial of a Rule 61 motion for postconviction

relief for abuse of discretion.[14]  We review legal and constitutional questions *de*

*novo*.[15]

## IV.  DISCUSSION

### A.

As mentioned, Sierra argues that his trial counsel were ineffective for (1)

failing to call available fact and expert witnesses, (2) failing to object to prejudicial

testimony offered by the State, and (3) failing to object to prosecutorial misconduct

during closing arguments.  He also argues that the alleged instances of ineffective

assistance of counsel must be considered cumulatively together with the reliability

and credibility issues surrounding the testimony given by Rone because of his

criminal convictions.  He argues that when the cumulative effect of these issues are

properly considered, he is entitled to a new trial under the reasoning contained in

this Court's decision in *Fowler v. State*.[16] He argues that, under that case, the

---

[12]  466 U.S. 668 (1984).
[13]  194 A.3d 16.
[14]  *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013) (en banc).
[15]  *Id.*
[16]  194 A.3d 16.

8

Superior Court was required to evaluate the effect of two alleged trial "errors" in conjunction with one another: (1) Rone's discredited reliability which calls into question the credibility of his opinion that all three bullets recovered were fired from a revolver (as opposed to a semiautomatic); and (2) the alleged ineffective assistance of counsel. Sierra asserts that, "[t]he trial court's failure to examine the errors cumulatively warrants reversal. Consistent with *Fowler*, given the other constitutional deficiencies in Mr. Sierra's trial, the State cannot satisfy the exacting standard that the Rone error is harmless beyond a reasonable doubt."[17]

In response, the State contends that Sierra has failed to establish that the alleged instances of ineffective assistance of counsel caused him actual prejudice as required under *Strickland's* second prong. It also contends that, unlike in *Fowler,* where Rone's testimony was deemed "critical to the State's theory of the case," Rone's testimony provided some context for the bullets recovered, but was not critical to the State's elements of proof. It also contends that, unlike in *Fowler,* Rone's testimony is not entangled with *Jencks* issues pertaining to key witnesses.

**B.**

Our analysis of Sierra's arguments will begin with a review of *Fowler v. State*.[18] In *Fowler*, the defendant was charged with offenses stemming from two

---

[17] Opening Br. at 48.
[18] 194 A.3d 16.

9

separate shootings. He was admittedly present at both. The charges from both incidents were tried together at one trial. The State's theory was that the defendant was the shooter at both incidents and that he used the same gun at both incidents. The evidence presented by the State included the testimony of four key witnesses and the testimony of Carl Rone. The defendant was convicted, and his convictions were affirmed on direct appeal.

During postconviction proceedings in Superior Court, it emerged that the State had failed to provide Fowler with *Jencks* statements[19] of the four key witnesses. To counter this problem, the State argued that the *Jencks* violations were harmless because the ballistics evidence from Rone was so strong. The Superior Court agreed and determined that the *Jencks* violations were harmless in an analysis that "heavily relied on 'the fact that ballistic evidence linked the same weapon to both incidents [that] makes the evidence of [the defendant's] guilt in each separate incident mutually reinforcing.'"[20] Thus, "Rone's testimony was vital to both the State's trial case and the Superior Court's opinion because if one accepted the expert's testimony that the same weapon was present at each incident, it gave the

---

[19] "Under the [*Jencks*] rule, the defense, upon demand at the time of cross-examination, is entitled to statements of government witnesses made to governmental agents if the contents thereof relate to the subject matter of the direct examination." *Hooks v. State*, 416 A.2d 189, 200 (Del. 1980).

[20] *Fowler*, 194 A.3d at 22 (quoting *Fowler*, 2017 WL 4381384, at *6 (Del. Super. Sep. 29, 2017)).

jury and the Superior Court a basis other than eyewitness testimony to conclude that

[the defendant] was the shooter."[21]

While Fowler's postconviction proceeding was on appeal to this Court, the

news emerged of Rone's above-described criminal offenses. The State then argued

in the appeal that Rone's testimony was not important to its case because there were

multiple eyewitnesses who testified that the defendant was the shooter at both

shootings. However, the witnesses the State relied on to overcome Rone's now

compromised testimony were the same four witnesses whose statements were not

provided to the defendant in violation of *Jencks*. This Court described the State's

arguments as follows:

> Thus, the State's argument is circular, and the State is
> trying to have each strand of arguably compromised
> evidence excuse the other. That type of argument
> undermines and does not promote confidence. Both the
> eyewitness testimony and the ballistics evidence were
> critical to the State's attempt to prove that Fowler was the
> shooter at both shootings.[22]
>
> . . . .
>
> Both of the strands of evidence that the State relied upon
> to prove that [the defendant was the shooter] have now
> been materially compromised in different ways, and the

---

[21] *Id.*

[22] *Id.* at 24.

11

State therefore cannot shore up the weaknesses of one strand with the other.[23]

The Court reasoned that the burden was on the State to prove that both the *Jencks* violations and the Rone issue were harmless beyond a reasonable doubt, and that the State failed to meet that burden. Based upon the "unusual confluence of events presented here,"[24] the Court vacated Fowler's convictions and remanded the case for a new trial.

*Fowler* should be viewed in the context of the "unusual confluence of events" present in that case. Key witness testimony was called into serious doubt by the *Jencks* violations. In this case, however, the eyewitness testimony of Plunkett and Napier and the testimony of Sierra's prison cell mates are not compromised by *Jencks* or other procedural violations. The defense had a full opportunity to cross-examine these witnesses. In addition, unlike in *Fowler,* the State has not engaged in circular reasoning in this case in an attempt to demonstrate that two compromised strands of evidence prove each other. The testimony Rone gave was that the three bullets were fired from the same firearm and that the caliber of the bullets was consistent with them having been fired from a revolver. Dr. Wentling's report agrees that the bullets were fired from the same firearm, but differs in that he could not determine the type of firearm from which they were discharged. This

---

[23] *Id*. at 26.
[24] *Id*. at 27.

difference of opinion is not sufficient to suggest that Rone's testimony was false or misleading.[25]   Furthermore, the Superior Court found, and we agree, that Rone's testimony was not so critical in this case as it was in *Fowler* in view of the eyewitness testimony and the testimony of Sierra's prison cell mates.   For these reasons, the Superior Court correctly distinguished the unusual circumstances in *Fowler* from the facts of this case.

## C.

We turn now to Sierra's claim that he received ineffective assistance of counsel at trial.   To prevail on an ineffective assistance of counsel claim, the defendant must satisfy the familiar two-prong standard of *Strickland v. Washington*.[26]   The defendant must prove that (1) his trial counsel's performance was objectively unreasonable and (2) his defense was prejudiced as a result.[27] Under the first prong, judicial scrutiny is "highly deferential."[28]   Courts must ignore the "distorting effects of hindsight" and proceed with a "strong presumption" that counsel's conduct was reasonable.[29]   The *Strickland* Court explained that "a court deciding an actual ineffectiveness claim must judge the reasonableness of

---

[25] Rone's testimony that the caliber of the bullets was consistent with them having been fired from a revolver is consistent with the fact that no shell casings were found at the scene of the crime.
[26] 466 U.S. at 687.
[27] *Id.* at 687-88, 691-92.
[28] *Id.* at 689.
[29] *Id.*

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[30]

Under the second prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[31] In other words, "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."[32] The movant "must make specific allegations of actual prejudice and substantiate them."[33] These allegations must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[34] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[35] "The 'reasonable probability' standard is less strict than the 'more likely than not' standard, but it requires more than a showing of a theoretical possibility that the outcome was affected."[36] In sum, the defendant must prove actual prejudice.[37]

The expert witness that Sierra's counsel did not call to testify is Dr. Ali

---

[30] *Id.* at 690.

[31] *Id.* at 693.

[32] *Id.*

[33] *Outten v. State*, 720 A.2d 547, 552 (Del. 1998) (en banc) (quoting *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996) (en banc), *cert. denied*, 517 U.S. 1249 (1996)).

[34] *Albury v. State*, 551 A.2d 53, 58 (Del. 1988) (quoting *Strickland*, 466 U.S. at 694).

[35] *Strickland*, 466 U.S. at 694.

[36] *Frey v. Fulcomer*, 974 F.2d 348, 358 (3d Cir. 1992), *cert. denied*, 507 U.S. 954 (1993) (citing *Strickland*, 466 U.S. at 693-94).

[37] *Strickland*, 466 U.S. at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney

14

Hameli. Dr. Hameli's hand-written report states that Bing was shot three times; that none of the bullets exited Bing's body; that all three bullets were fired by the same gun; and that "[c]onsidering the specific pathway directions of bullets (2) and (3) within the body, the assailant could not have been standing over the top of Mr. Bing's body, while he was lying on his back on the ground, firing his gun and striking Mr. Bing's body."[38] Sierra maintains that if Dr. Hameli testified, he would have significantly undermined Napier's testimony.

Sierra's two trial counsel filed affidavits as part of the Superior Court's postconviction proceedings. The lead trial counsel for the guilt phase of Sierra's capital trial explained in his affidavit that Hameli was not called because the State's own forensic pathologist, Dr. Adrienne Sekula-Perlman, testified during cross-examination at trial that the shooter did not stand over the victim, that he "would have been at an angle."[39] Specifically, Dr. Sekula-Perlman was asked, "Would you agree with me that if somebody testifies that somebody stood over Mr. Bing's body and shot down on it, that's an impossibility, given the nature of the injuries?"[40] Dr. Sekula-Perlman answered "Yeah, I would agree with you. They didn't stand right

---

performance are subject to a general requirement that the defendant affirmatively prove prejudice.").

[38] A662.

[39] A167.

[40] *Id.*

15

over him. They would have been at an angle."[41]   Lead trial counsel has explained that he did not think it necessary to call Dr. Hameli because this testimony from Dr. Sekula-Perlman, which was similar to Dr. Hameli's opinion, was already before the jury. This is a reasonable explanation for the decision not to call Dr. Hameli, and there is no reason to believe that Dr. Hameli's testimony would have affected the outcome of the trial.

Damarius Turnage and Mark Purnell are two of the fact witnesses that Sierra claims should have been called. They were incarcerated in the same prison as Napier. Defense investigative reports of witness interviews indicate that Turnage stated that Napier told him about the shooting, namely that: Sierra was not there, it was Jamal; Jamal and Napier drove to Reality's house that evening, and on the way, Jamal showed Napier two hand guns and gave him one; Jamal suggested the hold-up; Napier pointed a gun at the driver of the vehicle and said "You don't want to die over this, do you?"; Jamal shot the victim; and after the incident while in Jamal's car, Jamal pointed his gun at Napier and said to blame it on Sierra since he and Sierra look alike.[42]   Turnage stated that he did not know Sierra prior to hearing this information.

In his interview, Purnell stated that Napier told him that he lied and said Sierra

---

[41] *Id.*
[42] A653.

did the shooting; "[s]ome Philly dude did the shooting";[43] Napier does not care about Sierra; and Jamal was there and was the one who shot Sierra. Purnell stated that he did not know Sierra.

In his affidavit, lead trial counsel for the guilt phase explains that these witnesses were not called because they did not sound credible. All were convicted felons who seemed to counsel like witnesses who were told what to say by the defendant. Counsel believed that more would be lost than gained by calling these witnesses.

Sierra also argues that the defense interviewed several witnesses prior to trial that would have provided an alibi. Jay Michael Ringgold stated that on a Saturday in June he saw Sierra at a neighborhood barbecue; that he left at maybe eight or nine; and Sierra left at some time before him. Bryheen Mitchell stated that one day in the summer he went to a barbecue at "Flip" house; that Napier and Sierra were both there; and Sierra left at 7:30 p.m. Shannon Moore stated that Sierra was at Flip's Bar-B-Q; that Sierra arrived at five or six p.m.; that Moore did not know when Sierra left and did not know if Napier was also at the barbecue. William "Flip" Osborn stated that he had a barbecue on June 12, 2010 for his birthday; that Sierra arrived at three or four o'clock; and Sierra left with everyone else at approximately 7:30 to 8:00 p.m. Last, Fatimah Ali stated that she attended a birthday party for Napier's

---

[43] A654.

17

daughter in Brandywine park "on that day in June"[44] from one to four p.m.; that she then went to Flip's barbecue at 4:15 or 4:30 p.m.; that Sierra was already there when she arrived; that she left the barbecue at 8:30 p.m.; and that Sierra left at some time before she did.   All of these witnesses knew Sierra and all have criminal records. Trial counsel explains that these witnesses were not called because "they were not credible nor sufficiently established a time frame that would sustain a true alibi defense."[45]

"The decision of a trial attorney to call or not to call potential witnesses is a part of trial strategy."[46]   Trial counsel considered the witnesses and has offered reasonable explanations as to why they were not called.   The decision not to call a witness who defense counsel believes will not be viewed as credible by the jury or who will not help establish a viable defense is not objectively unreasonable.

Next, Sierra argues that trial counsel did not object to inadmissible and highly prejudicial testimony from both Succarotte and Napier.   Succarotte was asked why he contacted the Attorney General's Office with information about this case, and answered, ". . . But when you look in my eye and you tell me with no sympathy and

---

[44] A659.

[45] A471.

[46] *Baynum v. State*, 1990 WL 1098720, at *1 (Del. Super. Ct. June 8, 1990); *see also Benson v. State*, 2017 WL 5712814, at *2 (Del. Nov. 27, 2017) (TABLE) ("Defense counsel has the authority to manage the day-to-day conduct of the defense strategy, including making decisions about when and whether to object, which witnesses to call, and what defenses to develop.") (citing *Zimmerman v. State*, 2010 WL 546971, at *2 (Del. Feb. 16, 2010) (TABLE)).

just no nothing that you took a man's life and that – you know, that's a thin line."[47] The alleged prejudicial testimony from Napier occurred when Napier answered questions about the gathering at a house after the shooting, whereby Napier stated Sierra was "praising what he had done," "I mean, I guess, he like what he had done," and "one time he said this was his first one and this and that, referring to, I guess, murder." [48] Trial counsel has explained that, in his judgment, objecting to Sucacrotte's testimony and requesting a curative instruction "would draw more attention to the testimony, and it was not so prejudicial that . . . counsel would request a mistrial. Along the same lines, Napier's testimony did not sound credible or prejudicial to the extent to warrant an objection."[49] Counsel was entitled to make a reasoned decision not to object, and we are not persuaded that this testimony caused any actual prejudice.

Sierra's last claim of ineffective assistance of counsel is that his trial counsel failed to object to alleged instances of prosecutorial misconduct. Specifically, Sierra cites numerous statements made and PowerPoint slides shown by the prosecutor in closing arguments that were allegedly improper. We have reviewed all of these allegations of misconduct and have determined that none of them prejudicially affected the outcome of Sierra's trial.

---

[47] A273.
[48] A239-240.
[49] A471.

19

## V.     CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is Affirmed**.**